The government has filed a motion to reverse all of Mr. Garcia's convictions, conceding that the district court committed reversible error when it accepted the blanket invocation of the Fifth Amendment by the informant when called to testify as a defense witness. I thank the government and Mr. White for taking that step, and given the information in the motion and in Mr. Garcia's briefs, I would respectfully request that the Court grant the motion. I have nothing further to add unless the Court has questions for me. Kennedy Why didn't you join it? Waxman I'm sorry? Kennedy Why didn't you join it? Waxman I did. It was an unopposed motion, and I believe my non-opposition to it. Kennedy Well, if they make a motion and you say we don't oppose it, that doesn't mean you agree with it. Waxman I'm sorry if it was unclear, Your Honor. Kennedy Does it? Waxman I would say under normal circumstances, correct, but since we were asking for reversal of the convictions and the government conceded that, I apologize. I should have made it more clear by filing something or asking the government to make a clearer statement of our position in its motion. But to be clear, we are not opposing it, and we've always asked for reversal of Mr. Garcia's convictions, and we ask that the Court grant it. Kennedy You're not opposing it. You're favoring it. Waxman Yes. We join it, we favor it, we ask for it, we do everything we can to ask the Court to reverse the convictions. Kennedy Well, here you had a case. Here you had a case where the judge made a big mistake. With the informer. Waxman Correct. Kennedy He just gave a blanket pass as far as taking the stand is concerned. Waxman Correct. Kennedy And then the government went along with it, didn't call it to the Court's attention, Your Honor. I think we have a problem here. Psych case. That doesn't happen. Waxman No, they did not take that sentence to the Court. Kennedy So he was a good baby. Waxman Yes, he was. Kennedy And I apologize, Your Honor, I should have been clearer. I should have filed something. I don't know why I got, initially I got the impression that, well, you don't oppose it. You know, I went to trial, and the judge made a big mistake, and the government let it happen, and it goes back. And we have third trial issues here. Is there some double jeopardy issue in the Wings? Waxman Your Honor, I'm not aware. Kennedy Is there a problem here that, I mean, they had this independent lawyer there who was a panel member. He didn't probably think about immunity. Wasn't that in there? Waxman Yes. Kennedy So did you know about the grant for immunity? Waxman Yes, yes. It was the court-appointed lawyer for the informant, when he initially met with the informant and came to the conclusion that he should assert the Fifth Amendment, did not, was not aware of the immunity agreement, it was then brought out in court that there was this immunity agreement, so the ---- Kennedy When was that brought out? Waxman What? Kennedy When was that brought out? Waxman When the, after the court-appointed lawyer had first met with the informant, the first hearing with that attorney and the informant in court, the attorney made his initial position that there was grounds to invoke the Fifth, the defense brought up the fact that there was an immunity agreement, I believe the government as well brought up the fact that there was an immunity agreement, and then at that point, the court-appointed attorney said, well, I don't know anything about that, so there was a brief, less than 10-minute recess where the informant's attorney and the informant met. Kennedy Did you ever see that briefing? Waxman Yes, it's in the Excerpt of Record, Your Honor. Kennedy Well, I know it's in the record, if you search for it. Did you tell us where it was in the record? Waxman Yes, I believe I cited to it and quoted from it in my opening brief. Kennedy And what did you say in your opening brief? I'm not saying that you didn't, but I'm just asking. Waxman Because here we are, or here I am, and some others, maybe others have it, but here I am. I don't think I ever had a situation like this come up before, where the government is asking for a vacateur, a vacateur. Now, let's reverse and set it back for another trial, a vacateur. I never remember anything like that ever coming up before, and you wonder, well, why are they asking for it? Why? They don't give us any reason why they're asking for it. Waxman Well, Your Honor, first of all, I would like to point out that at page 27 I do cite and quote from the immunity agreement. That's in the opening brief. And the immunity agreement's at page 72 of the Civil Rights Act. Kennedy This is your opening brief? Waxman Yes. Kennedy Okay. What page is it? Waxman 27. Kennedy And what line? Waxman About midway down the page where it says counsel was referring to this provision in the informant's confidential source agreement. And it ends with footnote 195, which cites two cases. Kennedy It says, okay, it says, this is, does Garcia's counsel inform the court that if Hutkin invoked his Fifth Amendment right, of Garcia's counsel, that's you? Waxman Correct. Kennedy Yeah, okay. Fifth Amendment right against self-incrimination, that any activity he performed within the scope of his confidential source status he had immunity for, and therefore, they were entitled to question him regarding that activity. Counsel was referring to this provision in Hutkin's confidential source agreement. Now, that agreement, I'm just pointing this out to you, I've got a copy of it, but that agreement came into existence in 2004. Waxman I believe it was in the fall of 2011. Kennedy Fall of 2011. Okay. So now, referring to this provision in Hutkin's confidential source agreement, I quote, I understand that I have no immunity or protection from investigation, arrest, or prosecution for anything that I say or do except for activities specifically authorized by my controlling investigators pursuant to my cooperation with the DEA. I agree to abide by the instructions of my controlling investigators. Okay. Now, so you had a copy of that? Waxman Yes, at trial. Kennedy I never knew those things existed. I don't ever remember in the years I was a trial judge that there was such a thing as a confidential source agreement. I don't know what the arrangements were. Waxman Your Honor, I think it may depend on the case and the agency as to whether such agreements exist and what they look like, but these do come up occasionally when there's a formal relationship between a government agency. Kennedy Well, does this lawyer from the panel, did he know about a confidential source agreement? Waxman Well, as I point out in this section of the brief, he initially did not. Kennedy He did not. And he's supposed to be an experienced defense lawyer. Waxman Okay, so we have that now. I found it yesterday. You know, I'm going through about 30. Well, not that many because I'm only sitting four days. Got big stick records. Did you hook up a copy of that? Kennedy Did I look up a copy of the? Waxman Hook up a copy of your brief. Kennedy Oh, you mean attach it? Waxman Yeah. Kennedy No, I didn't, Your Honor. Waxman Yeah. Kennedy And you said, I see you tell me I can find it on 195. That's ER 9? Waxman Sealed excerpts of record, page 72. Kennedy Sealed excerpts of record, 72. Waxman And I apologize if I didn't make it. What? Because I italicized a portion of the quote that I took from the agreement. That italics does not appear in the original. I put that in there for emphasis. Kennedy Oh, it's up there. Okay. Yeah. All right. Well, of course, I'm not going to give him immunity if he doesn't. If he doesn't perform as they expect him to perform. So why did you agree to this, to say you agree? Waxman To vacating the convictions? Because that has always been the relief that we. Kennedy You had no other thing in mind? Waxman No, Your Honor. I mean, if Your Honor alluded to before double jeopardy issues, I'm not aware of any. But certainly if the court thinks there may be a double jeopardy. Kennedy Maybe there is. I mean, he's going to trial now, a second trial. Right? Because the judge made a big mistake and the prosecutor made a mistake by not calling that problem to the judge's attention. The site. Waxman That's true, Your Honor. I mean, I'm aware that when convictions are reversed for insufficient evidence, there's a double jeopardy bar. But most other trial errors do not result in a bar for. Kennedy I know that, but this is a trial error. This is a trial error that's resulting in a retrial. So he's going, you know, first of all, now that I've dug into this further, now that I've learned more about this confidential informant, I don't even know why you raise an entrapment defense. You know? Waxman You don't know why we raise it? Because of the informant. Kennedy How do you expect to succeed on it? Waxman Well, the defendant's contention has always been that the informant basically threatened him into participating in these activities, but for those threats and the fear that was created by the informant that he would not have engaged in this activity. Kennedy Well, the informant, Garcia was an old hand in this business. Waxman There's no evidence of that at all, Your Honor. The evidence is the government. He was not on the government's radar in any way until the informant brought him to the attention of that. And except for my client's prior conviction for one time having drug possession, he has no prior criminal history of drug sales. And the only thing he admitted to would be occasionally selling small amounts of marijuana. Kennedy Yeah, but if you look at the video, he's been doing this a long, long time. Waxman I disagree with that assessment, Your Honor. And I think what's more important, I think that if – Kennedy Have you looked at the video? Waxman Oh, I've watched it a couple of times, Your Honor. Kennedy A couple of times. Waxman But more important, I think the jury saw the video. Kennedy Is he a rookie? Waxman I don't think – I mean, I've seen every season of The Wire, and I'm sure I could fake my way through a drug deal with some degree of convincingness. But I think what's most important is that the jury saw this video. And if it was as clear as Your Honor is suggesting or as the government argued at trial, they would have been back in 15 minutes with a conviction. They weren't. In a trial where the – Kennedy That doesn't mean anything. You know, they'd be back in 15 minutes with a conviction. I remember in traffic tickets, juries would be out for two days sometimes. You know, the amount of time it takes for them to make their decision, that really doesn't have much relation to the difficulty of the case. Waxman Well, to add on to that, Your Honor, the fact that the – Kennedy Our process goes on from the minute the trial starts. Waxman Right. But, Your Honor, I also think it's significant that two of the questions they asked during the long period of deliberations were about the informant, why didn't he testify and how do we judge when he was acting as a government informant. So I think that is strong evidence, coupled with the length of deliberations, that they were struggling with this entrapment. Kennedy Well, I wonder why he didn't testify. I wonder about it. Waxman Correct. And I don't think that it would have caused them much concern if they weren't somewhat interested in the entrapment defense. Kennedy Well, you wanted the informant to be called to testify, right? Waxman Correct. Kennedy And what was your argument? Waxman Well, first of all, I wasn't in trial counsel. But the argument at trial was, I mean, that they wanted that the entrapment defense – Kennedy Well, did the defense call the court's attention to that critical case? Waxman What critical case is that? Kennedy The one that is cited in the briefs about you just don't have a blanket grant of honor. Waxman No, Your Honor. No. I mean, the defense counsel didn't cite a case, but everything it said as far as what the rule was, was accurate in its statement of what the court should have done. Following the general rule of Pierce, having a question-by-question inquiry of the witness to gauge whether he could invoke the Fifth Amendment, and if so, what would the scope of any Fifth Amendment privilege he had. Given my business initiative came up during trial, it wasn't something that was argued in pretrial motions where they were back at the office and able to file written motions. It was done, you know, on the fly. Well, we'll hear from the government. Waxman Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Ryan White for the United States. I have a few things I'd like to address based on the Court's colloquy with defense counsel. First is, Judge Pregerson, you asked or noted that the government had not stated its reasons for asking for a vacatur, whether it's styled as a reversal or a vacation of the or vacater of the convictions. The government in its motion noted that while we initially, when I drafted the answering brief and consulted with the appeals unit, believed that the district judge had not committed error, or if it was error, it was harmless, I am always open to reconsidering my opinions. After reading Mr. Laughlin's reply brief, which I thought was very well written and I thought raised some distinct points and placed the issue in a different light than I had previously thought about it, and then after rereading the entirety of the record in preparation for this argument. Did he write the brief? Yes, he did, Your Honor. He wrote the reply brief and the opening brief, and I wrote the answering brief on behalf of the government. I reread the entirety of the record, which is quite large, with an eye toward Mr. Laughlin's arguments. I then had a moot with four assistant U.S. attorneys, three of whom are in the criminal appeals section, one of whom is a deputy chief there. And it became very clear after that moot. Tell me what a moot is. A moot is a. I don't know what it is, but some people might know. A moot is where we stage a mock argument where we have three or, in this case, four members of the U.S. Attorney's Office pretend to be. So you do that in the U.S. Attorney's Office. We do that. The U.S. Attorney's Manual suggests, in certain circumstances, mandates and other circumstances suggests it, but it is our office practice in every case, with very rare exception, to do a moot. Every oral argument I've had, I've had mooted. It always helps further clarify and define issues. This is the first instance where I really realized that I was wrong. But after the moot and after the questions posed by the judges, quote, unquote judges, in our office, I realized that I was wrong. And promptly, that was on Thursday. Wrong about what? I believe that the district court did here err in accepting the blanket assertion of the privilege. And the reason we asked for remand. And part of your job is to see that the district judge stays on the straight, narrow path, right? Yes. Both the government's job and the defense counsel's job. And I do think the defense counsel did do an admirable job here, both on appeal, but down at the trial level. I'm trying to help him maintain that record, but go ahead. Thank you, Your Honor. At the trial court, the colloquy that defense counsel had with the district court judge, defense counsel pushed repeatedly to have some sort of, whether it's an in-camera proffer or some sort of back-and-forth questioning as mandated by Pierce, and it was not accepted. But the district judge was well aware of that opportunity. And I would note, to point out what the district judge did right here, you know, under SUI, or T-S-U-I, however you say that case, the exception to the Pierce rule is where the district judge has, you know, extensive knowledge about the case, which in this case the district judge did have because the government's entire case in chief was over. The defense had put on five witnesses at that point. Defendant had testified for nearly a day across two days. Where the district judge has extensive knowledge of the case and does things like communicating with the witness's counsel, engaging with counsel for the government, engaging with counsel with the defendant, that in certain circumstances the court can accept a blanket invocation of the Fifth Amendment privilege where the court can determine that virtually all relevant questions would be privileged. In this case, initially, I believed that either under the defendant's theory, which I do not believe is correct, I don't believe the defendant's testimony is true, but under his theory that the informant entrapped him, the informant would have a Fifth Amendment privilege. And under the fact that the government believes to be true, based on what the informant told us in pretrial interviews and which defendant was aware of and which the court was aware of, that under that theory, namely that the defendant had instead given him cocaine, given the C-I cocaine as a thank you for the deals, for setting up the deals, that under either theory the informant would have a Fifth Amendment privilege. I have since come to the point of view. Kennedy. So you're relying on what the informant was telling you. Fisher. Not only what the informant was telling us. So when you're not. Kennedy. So did you ever read Judge Trott's article? Fisher. Of course, Your Honor. Kennedy. What would he advise you to do? Fisher. He would advise me to do precisely what I did in this case, and I can walk you through it. First, defense counsel called me. This is not all in the record. Okay, I don't want to speak too much, but first, defense counsel advised me of Mr. Garcia's story about entrapment. I naturally was very, very concerned about that, and I asked my agents to go interview the informant. The informant denied it. This is in the record. The informant denied it and stated instead it was the defendant who sold cocaine to him as a thank you after each deal. Either gave or sold cocaine. We then didn't stop there. We interviewed the informant's wife, who testified at trial. Now, if you'll permit me, this part's not in the record, but now that we're going back on remand, I think it's probably not that big of a deal. The informant's wife told us that she was with the informant on multiple occasions when they went to Mr. Garcia's house and Mr. Garcia gave him cocaine. So that corroborated what the informant told us. That, coupled with the strength of the trial evidence here, I acknowledge that there was an error and we're asking for it to be sent back. But putting that error aside about the failure of the CIA to testify, the government's evidence was incredibly strong here. We believe that the defendant's testimony is entirely inconsistent with that evidence, namely the videos and the audio that Your Honors have seen, which show that the defendant not only was able to produce three and a half pounds of methamphetamine, a total over three occasions, but that he was incredibly comfortable and fluid. That was the total, not the last one. That was the total. There was 109 grams. The last one he had three pounds. 109 grams, followed by 222 grams, followed by about three pounds, each of which is well over the 50-gram threshold. He used code language. He had multiple phones. He just demonstrated lots. Very skilled. Very, very skilled drug dealer. On top of that, he approached the government a month after the informant had been incarcerated and acknowledged that he had not been able to reach the informant for a month. And then he interviewed. He said nothing about the testimony that he said at trial. He identified multiple suppliers of methamphetamine, and then he placed a call and ordered approximately a pound of methamphetamine from a drug dealer who showed up. Now, he did not show up with drugs, but the transaction was arranged, right? All of this evidence we think is incredibly strong, that he not only is a drug dealer, but that he was predisposed to sell this quantity of drugs. Now, with that said, as Your Honor pointed out and as Judge Trott has pointed out, my job is to do justice, right? I'm not. I'm not criticizing you. You know, the first thing I saw on this case was these papers. The motion to vacate, Your Honor? Yeah. And I wondered. How it came about. What? And you wondered how it came about. I wondered how it came about, what's going on here. And I hope I've been able to satisfy Your Honor. Maybe you should have done it in here. And given more reasons, Your Honor? I never had this ever happen before. It's unusual, Your Honor, I acknowledge, and that goes to, you know, the weight that I place. Once I spend a lot of time going into this, look, I'll tell you. I'm going to vote to grant your motion. But I wanted to know what's going on, that's all. It would have been helpful if I had a pretty good idea of what's going on. I got even here, you know, the other night. What about the grant of immunity? Where's the document? You know, I finally found it, you know. So I'm curious. You had a moot court, and you didn't do too well in the moot court? Perhaps I'm doing better here, I hope. I can only do better here, then. You didn't convince the judges there that that was the right answer? That's right. And did they make a recommendation to you? Yes, Your Honor. This came about, candidly, before I filed the opening brief. I saw Mr. Laughlin's arguments. I thought they were good arguments. But I still, especially I think perhaps colored by what I think is the strength of our evidence here, which does go to the double jeopardy issue, which I can come back to. I believe that we had a very defensible position after the reply, after we reviewed it. There is a double jeopardy issue lurking back there. I disagree. Oh, I thought you were agreeing with me. No, no. I don't, Your Honor. But if I may return to Judge Reinhardt, just what we were talking about. Then I'll come back to double jeopardy, if you'd permit me. It was a process. I was initially concerned before I filed the opening brief. I met with the appeals unit. We agreed that we thought it was defensible based on the way we viewed the case at that time. After reviewing the reply brief, which I think placed it in a different light and made different arguments, and then re-reviewing the record, preparing for a week. I prepared for over a week. I've got extensive notes here on every issue in the case and re-read every case and re-read the record. And then going before the moot panel, it became clear not only to me but to my mooters that it was not a defensible position. So the mooters, the appeals unit, recommended that we seek the release that we sought. I concurred with that. I obtained very rapidly criminal chief approval. I had to go back to DOJ and D.C., obtained. I didn't need approval, but I consulted as required and then promptly contacted Mr. Laughlin about the defendant's position on this and filed the motion as quickly as we could with the hope that, Your Honors, I recognize you may have prepared and your law clerks may have prepared, but the hope that you wouldn't take your week in preparing for this case. I commend you for what you've done. All right? I commend you for what you've done. If I had a kind of a certificate, I'd give it to you right now. Thank you, Your Honor. You can do this. Yes. Now I understand what's going on. Thank you, Your Honor. If I may return to Your Honor Judge Pregerson's point about double jeopardy. As Mr. Laughlin pointed out, where convictions are reversed based on insufficiency of the evidence, then the court engages in an assessment as to whether or not there I don't think there is a double jeopardy issue here. This court frequently, all the time, reverses trial courts for errors and remands for a retrial. Unless it's outrageous government conduct, in which case you can reverse and not have double jeopardy. But I haven't heard any allegations. Your Honor is correct. I'm not a judge who honors cases in which I concur. Your Honor is correct about, yes, the rule that outrageous government conduct can be a reason for double jeopardy violations. And Your Honor is also correct that there's no allegation here. There has not been in any of the pleadings. I don't believe that's defendant's position. Even if that were defendant's position, I would strenuously oppose that. I don't believe that there was any outrageous government conduct here. Well, I think we've explored this issue sufficiently already for a vote. Okay. Thank you, Your Honors. No, it's fine. I mean, it's just, you know what, I get something like out here. Well, we've done this. Please sign. Your Honors are free to style your order however you wish it to sound. No, no, no. We're just, don't worry. It'll be very, just a few words. Okay? Thank you both very much. How about granted? Is that good enough for you? That would be great. Thank you, Your Honor. I appreciate it. Thank you for your time. The motion is granted. Any opposition? I'm hearing none. It's granted. Good job. All right.
judges: Pregerson, Reinhardt, Nguyen